OASIS, MIDWEST CENTER FOR HUMAN POTENTIAL, Plaintiff-Appellant, *v.* EDWARD J. ROSEWELL, Cook County Collector, *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 76-1398

Opinion filed November 29, 1977.

852

Robert J. Burdett, of Chicago, for appellant.

William J. Scott, Attorney General, and Bernard Carey, State's Attorney, both of Chicago (Stephen R. Swofford, Assistant Attorney General, and Paul P. Biebel,

Jr., and Lawrence N. Halperin, Assistant State's Attorneys, of counsel), for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Oasis, Midwest Center for Human Potential (hereinafter "Oasis"), brought an action seeking to enjoin collection of real estate taxes for 1973, 1974 and 1975 against certain real property located at 7463 North Sheridan Road in Chicago, Illinois. Those joined as parties defendant include the successors in office of Cook County Collector and Cook County Assessor as well as National Indemnity Corp. and Virginia Steding, holders of tax sale certificates on the subject property for the years 1973 and 1974. On the authority of *Illinois Institute of Technology v. Skinner* (1971), 49 Ill. 2d 59, 273 N.E.2d 371, the trial court sustained defendants' motion for judgment on the pleadings with respect to the 1973 taxes. Upon hearing evidence, the trial court denied plaintiff's complaint for an injunction regarding the 1974 and 1975 taxes.

The issues presented for review are as follows: (1) whether plaintiff's use of the subject premises constitutes "school purposes" within the meaning of the Illinois Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 500.1) so as to entitle plaintiff to a real estate tax exemption; (2) whether, alternatively, plaintiff's use of the subject premises constitutes "charitable or beneficent purposes" within the meaning of the Illinois Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 500.7) so as to entitle plaintiff to a real estate tax exemption; and (3) whether the trial court properly ruled that plaintiff's failure to obtain an exemption for 1973 taxes from the Department of Local Government Affairs pursuant to section 119 of the Illinois Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 600) or appeal therefrom precludes relitigation of the issue in a court of equity.

Oasis was organized as a "growth center." It was incorporated in 1968 on a not-for-profit basis. Its corporate charter provides that its purposes are "[t]o discover and disseminate those truths in religion and philosophy and the behavioral sciences which promote actualization of human potential and growth." Oasis was initially funded by a two-year "seed grant" from the Stone-Brandell Foundation.

In 1972, the property in question was purchased from the Henry Crown family. It is described as a residential, three-story frame dwelling. On the first floor are three rooms used for seminars as well as a kitchen and breakfast room; on the second floor are three additional seminar rooms and two baths; the third floor is occupied by a custodian as living quarters. Space in an attached two-car garage is rented to the public on a monthly basis.

Oasis conducts approximately 150 programs per year. Its brochures characterize Oasis activities as follows:

"Using an environment enhancing trust and openness, Oasis workshops provide opportunities to heighten self-awareness, increase understanding of the ways others see us, and develop more effective ways of dealing with each other. These opportunities generally are provided through the demonstration and practice of carefully designed group experiences. Programs are oriented toward the average person who wants to get more out of life, increase his or her professional skills, become a better spouse or parent, or find ways to a new and better life style.

Many people who have attended Oasis have expressed a strong interest in becoming more involved and keeping in touch with what is happening at Oasis. Similarly, we at Oasis have increasingly felt the need to involve more people in our expanding community. We want and need your energy, participation and support. We have developed our membership program as a means of bringing us together. This is your invitation to join.

Benefits include:

A member's discount on all Oasis workshops. (Does not include single-evening events.)

Six special events each year for members only. (Special parties, weekend workshops designated for members only, one day free group experiences.)

Use of Oasis Farm for fun and play on specific weekends.

Once-a-month Members Evening at Oasis House. (Wine-and-cheese parties, folk music, dancing, poetry evenings, or other social events, to be announced in the newsletter.)

Priority in registering for workshops and seminars.

'Here and Now,' the Oasis newsletter.

Special events announcements and other special mailings.

\* \* \*

| | |
|---|---|
| ONE YEAR INDIVIDUAL MEMBERSHIP | $ 15 |
| LIFE MEMBERSHIP | $500" |

The general concern of these programs is with the field of humanistic psychology. Within this rubric are included several "approaches to personal growth" such as gestalt, Eastern thought and meditation, body awareness and movement, encounter and interpersonal techniques, psychosynthesis and psychic ability. The programs may be classified into three divisions: post-graduate for professionals (*e.g.*, physicians, therapists, nurses, social workers); adult education classes which are limited to the specified subject matter; and "frontier areas" which involve "new developments in human awareness." Oasis does not purport to concern itself with traditional educational disciplines such as reading,

mathematics, writing, history or literature. Courses included within the Oasis catalogue were "Introduction to Rolfing," a "Weekend of Zen Shouting," "Making Friends With the Opposite Sex, A Social Encounter Weekend" and "Turn Your Body On: Massage, Greek Belly Dancing, etc." The latter course is taught by one Merle Stine, a housewife who, according to the course catalogue, "knows where her body is."

Oasis adduced the testimony of several expert witnesses, possessing extensive educational backgrounds, in support for the proposition that the activities offered by Oasis fit within the general scheme of education provided by the State of Illinois in its tax supported schools. These witnesses also testified that State tax supported schools would present courses similar to those provided by Oasis were they not bound by fiscal constraints.

Oasis boasts a total membership of approximately 1,000 individuals. Membership dues are $15 per year. In addition to such charges, Oasis' income is supplemented by fixed fees charged for participation in each program. These charges range from $15-$150 and group participation is open to the general public. Members of Oasis are able to obtain discounts on these fees. According to testimony adduced by Oasis, in 1974 Oasis maintained a gross income in excess of $160,000; in 1975, Oasis' gross income was in excess of $140,000. In each case, $8,000-$10,000 was directly attributable to membership dues. During the course of trial proceedings, some mention was made of an operational deficit. No evidence was adduced in support of this point.

It was established that during the relevant time period approximately 2,000-6,000 individuals attended Oasis' programs. Scholarships were available, however, according to the various witnesses, no full scholarships were ever awarded. Partial "work-study" arrangements were more often provided. The officers and directors of Oasis serve without compensation. The organization employs two full-time salaried employees.

■■ Article IX, section 6 of the Illinois Constitution of 1970, like its predecessor, section 3 of article IX of the 1870 Constitution, provides in pertinent part that the General Assembly may exempt from property taxation only "property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Such provisions are neither dependent upon other constitutional directives nor self-actuating. Accordingly, the legislature has exempted, first, "* * * all property of schools, including the real estate on which the schools are located and any other real or personal property used by such schools exclusively for school purposes * * *" (Ill. Rev. Stat. 1975, ch. 120, par. 500.1) and, second, "All property of institutions of public charity, all property of beneficent and charitable organizations, * * *

when such property is actually and exclusively used for such charitable or beneficent purposes, * * *." Ill. Rev. Stat. 1975, ch. 120, par. 500.7.

It is under these two provisions that plaintiff claims exemption. In considering such claims it is to be borne in mind that courts have always taken the position that statutes granting tax exemption should be construed strictly in favor of taxation. (*Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 146 N.E.2d 73.) Within this context, plaintiffs bear a heavy burden which must be met in order to establish the exemption that they claim. Every presumption is against the intention of the State to exempt property from taxation. (*Milward v. Paschen* (1959), 16 Ill. 2d 302, 157 N.E.2d 1.) Plaintiffs must clearly show that the specific property for which exemption is sought is within the contemplation of the law. *Rotary International v. Paschen* (1958), 14 Ill. 2d 480, 153 N.E.2d 4.

■■ In *Coyne Electrical School v. Paschen,* it was held that in order to entitle a private school to the privilege of tax exemption, two primary tests must be met: (1) it must offer a course of study which fits into the general scheme of education established by the State; and (2) the course of instruction must be such that it substantially lessens the tax burden of the public by providing educational training that would otherwise have to be furnished by the government. The taxable status of property is not to be determined solely or necessarily by whether the owner or operator may be characterized as a "school." The mere fact that class instruction in useful subjects is conducted and, hence, that a "school" of some kind is maintained, is not sufficient. On the other hand, it is not essential, for exemption, that classroom instruction be given at the site. (*Association of American Medical Colleges v. Lorenz* (1959), 17 Ill. 2d 125, 160 N.E.2d 763.) The test is use, not ownership or proximity to classroom work. A private school need not duplicate the program of a public school in order to gain tax exemption. (*Illinois College of Optometry v. Lorenz* (1961), 21 Ill. 2d 219, 171 N.E.2d 620.) However, as was cogently pointed out in *Milward v. Paschen*:

> "* * * [T]he basis for tax exemption in Illinois is the relief that such tax exempt institutions provide to the taxpayers' burden. By assuming some of the burden which otherwise must be borne by the taxpayer, an institution may qualify for tax exempt status. [Citation.] Thus only may tax exemption be recognized in our society. Consequently, only by comparison with the course of study offered in the tax-supported system of education may a private institution qualify for tax exempt status." *Milward v. Paschen*, 16 Ill. 2d 302, 309.

■■ In the case at bar there is no showing that plaintiff's course of study fits into the scheme of education offered by public schools.

Although not decisive, plaintiff offers no courses in such traditional disciplines as reading, writing, mathematics, history or literature. Nor is there evidence that plaintiff's instructors are qualified to teach in Illinois schools or institutions of higher learning. Nor does it appear that Oasis offers a methodology common to such public institutions. Indeed plaintiff's experts candidly testified as to the unique character of the Oasis experience. While the programs offered at Oasis may be deemed "educational" in a broad sense, it cannot be maintained that plaintiff's course of study fits into the scheme of education currently in vogue in Illinois and against which the Oasis program must be measured. That plaintiff's members may appreciate this fact as plaintiff's virtue rather than its vice does not serve to alter the fact that plaintiff's use of its property does not qualify it for tax exempt status.

The cases of *Association of Medical Colleges* and *Illinois College of Optometry*, relied upon by plaintiff, do not mandate a contrary conclusion inasmuch as these cases are factually distinguishable from the case at bar. In both cases the institutions applying for exemption were beneficiaries of a clear legislative mandate in support of their particular activities and the benefits which inured to the public were self-evident.

The record in the instant case is barren of any indication that the instruction offered by Oasis substantially lessens the burden of taxation occasioned by our public school system. Plaintiff urges that certain changes in language between the 1870 and 1970 education provisions of the Illinois State Constitution reflect a complete alteration in the State's attitude toward schooling. Citing examples of contemporary teaching methods, plaintiff concludes that pursuant to the 1970 constitutional provision a very wide-ranging definition of "schools" is to be applied under the revenue tax exemption statutes. According to plaintiff, "Any kind of a teaching whatsoever tending to educate any citizen would be a school effort under such a definition."

■■ Article VIII, section 1 of the 1870 Constitution required that the State provide "a good common school education." Article X, section 1 of the Illinois Constitution of 1970 states, in part:

> "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities."

In our opinion, the modern language does nothing more than add terms which are descriptive and illustrative of the goal of public education in Illinois. Such hortatory language does not signal the drastic alteration of legislative policy envisioned by plaintiff with respect to the collection of revenue. Thus, whether plaintiff's activities are measured against the restrictive meaning which has attached to the relevant exempting statutes, or by the public gain which must inure before property is released from

bearing its proportionate share of taxes, it is apparent that its claim to exemption must fail. *Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 146 N.E.2d 73.

■■ ■ Nor has plaintiff demonstrated that the property is used exclusively for charitable purposes as we interpret the statute in light of the case law. In order to sustain a claim of exemption in this regard, the evidence must establish, first, that the property is owned by a charitable organization, and second, that it is exclusively used for charitable purposes. (*Coyne Electrical School v. Paschen.*) The distinctive characteristics of a charitable organization are that it has no capital, capital stock or shareholders, earns no profits and pays no dividends, but rather derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in the charter. (*Rotary International v. Paschen* (1958), 14 Ill. 2d 480, 153 N.E.2d 4.) In the instant case, some evidence was adduced to the effect that the Oasis was initially funded by a "seed grant" from the Stone-Brandell Foundation and that at the time of its purchase of the subject premises, Oasis was the beneficiary of a donation by the Henry Crown family. However, testimony was also adduced which established that since its inception Oasis earned a gross income in excess of $160,000 in 1974 and in excess of $140,000 in 1975. In each case, $8,000 to $10,000 was directly attributable to membership dues. The obvious income differential is not expressly accounted for by competent evidence. During the course of trial proceedings it was suggested that 2,000-6,000 individuals attended over 150 Oasis programs and were charged $15-$150 as the price of participation. A considerable amount of income would be derived from this source. While some mention was made by several witnesses that plaintiff operated at a deficit, no evidence was adduced in support of this point. Hence, the record fails to establish that plaintiff is a charitable organization as that term has been defined by the relevant case law.

■■ Nor is it clear that the subject property is used exclusively for charitable purposes. Charity does not necessarily mean alms-giving but, in a broader sense, is defined as an application of property for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering and constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens on government. (*Coyne Electrical School v. Paschen.*) However, to qualify property for exemption from taxes, the benefits must accrue to mankind directly and it is not sufficient that incidental benefits may come to the public as a result of the property's use. *International College of Surgeons v. Brenza* (1956), 8 Ill. 2d 141, 133 N.E.2d 269.

■■ Measured by these decisions it is apparent that plaintiff has not performed any acts of charity during the years for which exemption is claimed. Testimony was adduced that while full scholarships were available, none were ever awarded and that partial awards in the nature of a work-study program were the rule. There is no benefit directly to mankind in general from the activity of the Oasis differing from that associated with any lawful endeavor. Such incidental benefits as may accrue do not afford a basis for tax exemption.

■■ Plaintiff finally contends that the trial court erred in ruling that plaintiff's failure to obtain an exemption for 1973 taxes from the Department of Local Government Affairs pursuant to section 119 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 600) precludes relitigation of the issue in a court of equity.

■■ The holding of *Illinois Institute of Technology v. Skinner* (1971), 49 Ill. 2d 59, 273 N.E.2d 371, is dispositive of plaintiff's argument. The judgment of the *Skinner* case is summarized in *Lopin v. Cullerton* (1975), 26 Ill. App. 3d 748, 751, 326 N.E.2d 130, 132:

> "* * * it was held that although equity will take jurisdiction where property is exempt from taxation, if the party elects the remedy before the board of review he is not thereafter allowed to abandon it and then go into equity; but he may go into equity in the first instance and have relief. The court there held the statutory remedy to be adequate, and when its decision was invoked, to be exclusive. The rule there established was that where remedies are provided by statute which are cumulative, such remedies are exclusive only where they have been first invoked by the taxpayer."

Similarly, in the instant case taxes were levied against the subject property for the year 1973 in the amount of $1,487.81 and upon complaint and hearing before the Board of Appeals of Cook County, that Board adjudged the property to be exempt from taxes. This exempt status was disapproved by subsequent action of the Board of Local Government Affairs. Plaintiff then attempted to relitigate this decision before the circuit court of Cook County at a *de novo* hearing. This procedure is specifically disallowed by *Skinner*. Plaintiff's attempt to distinguish *Skinner* based upon the venue of the subject property does not serve to lessen the applicability of the relevant statutes or diminish the review procedure therein described. (Ill. Rev. Stat. 1975, ch. 120, pars. 600, 619.) Plaintiff may offer the claim of exemption as a defense in any judicial proceeding for the collection of taxes on the subject property pursuant to section 119 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 600), and, when such defense is offered the question of exemption shall be determined by the judgment or the decree of the court. This procedure adequately safeguards plaintiff's right to due process of law.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING, P. J., and PUSATERI, J., concur.