57 P.3d 793

**In the Matter of the Appeal of Community Action Agency, Inc. from the Order of the Board of Equalization of Nez Perce Equalization of Nez Perce the Appeal of Community Action Agency, Inc., from the Idaho Board of Tax Appeals Decision in Appeal No. 98–A–7402.**

**COMMUNITY ACTION AGENCY, INC., Petitioner–Appellant,**

v.

**BOARD OF EQUALIZATION OF NEZ PERCE COUNTY, Respondent.**

No. 26921.

Supreme Court of Idaho, Boise, April 2002 Term

Oct. 23, 2002.

Douglas W. Whitney, Moscow, for appellant.

Hugh G. Jacobs, Lewiston, for respondent.

SCHROEDER, Justice.

The Community Action Agency, Inc. (CAA) appeals the decision of the Board of Equalization of Nez Perce County (the Board) to revoke its property tax exemption in 1999. CAA maintains that it is a charitable corporation under I.C. § 63–602C because it provides low-income housing to residents in Lewiston. CAA also argues that the Board is estopped from revoking the property tax exemption. The Board determined that CAA was not a charitable corporation, because its residents were required to pay rent, CAA received federal and state grants, and that it did not provide a general public benefit.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

The parties stipulated to the facts in this case. CAA is an Idaho non-profit corporation and has been granted a federal tax exemption pursuant to § 501(c)(3) of the Internal Revenue Code as a charitable corporation. CAA has been granted an exemption from Idaho State Sales Tax as a "health related entity." CAA is governed by an unpaid Board of Directors consisting of one-third elected public officials, one-third democratically elected persons to represent the low-income population, and one-third representatives of business, industry, labor, religious, welfare, education or other major groups and interests.

CAA provides low-income housing for residents near Lewiston, Idaho. Three apartment complexes it owns are the subjects of this case: Six Pines Apartments, Ponderosa Court Apartments, and Clearwater Terrace Apartments. The construction of these buildings was financed with the assistance of the Idaho Housing and Finance Association (IHFA) and HOME program loans, which are federal no interest loans. The HOME program does not provide for annual operating expenses. CAA receives no project-based subsidy from any government agency for payment of any portion of the rent on the apartments. Some of the occupants have applied for and received rent assistance from IHFA and under the HUD Rental Assistance voucher and certificate program for rental assistance. In the event CAA defaults in the payment of the HOME loans, IHFA will become the owner of the properties.

The occupancy criteria for the complexes is governed by the HOME program. Applicants for at least 20 percent of the units must have a household income not exceeding 50 percent of the Area Median Family Income determined pursuant to 24 CFR part 5. Those living in the balance of the apartments must have a family income less than 60 percent of the Area Median Family Income. CAA has never evicted a tenant.

CAA rents the apartments for the following rents: All two-bedroom apartments for $380 per month. The three-bedroom apartments in Clearwater Terrace rent for $465 per month and the three-bedrooms in Six Pines and Ponderosa Court for $495 per month. The Nez Perce County Assessor has set the economic market rents for the apartments as follows: Clearwater Terrace—two bedroom at $475 per month and three bedroom at $550 per month. Six Pines—two bedroom at $450 per month and three bedroom at $525 per month. Assessor market rents are not available for Ponderosa Court. Gary Chase, an Idaho Certified General Appraiser, has set the following market rents for these apartments: Clearwater Terrace—two bedroom at $540 per month and three bedroom at $600 per month. Six Pines—two bedroom at $575 per month and three bedroom at $625 per month. Ponderosa Court—two bedroom at $550 per month and three bedroom at $600 per month.

The Annual payment on the HOME program loan for the apartments is $37,313.00. CAA revenue and expenses for the apartments in 1999 were: rental income—$103,603; expenses—$104,325. In 1999, CAA received $3,563,810 in grants from federal, state, and local governments, charitable contributions from utility companies, United Way and individuals, Program Service Fees, housing income and other income, and Idaho and Washington CSBG grants. The value of private contributions to CAA in 1998 was

$760,575.01. However, the donations applicable to the housing project amount to only a few thousand dollars. The vast majority of private contributions are applicable to other functions of CAA.

In 1999 the Board revoked the property tax exemption that had been previously granted. This decision was upheld by the Board of Tax Appeals and district court which relied on this Court's ruling in *Housing Southwest, Inc. v. Washington County,* 128 Idaho 335, 913 P.2d 68 (1996). CAA appeals to this Court, arguing that it is a charitable corporation under Idaho law.

## II.

### STANDARD OF REVIEW

■ "Interpretations of requirements for charitable exemption from property tax are questions of law over which the Court exercises free review." *Housing Southwest, Inc. v. Washington County,* 128 Idaho 335, 337, 913 P.2d 68, 71 (1996) (citing *Owyhee Motorcycle Club, Inc. v. Ada County,* 123 Idaho 962, 964, 855 P.2d 47, 49 (1993)). "Statutes granting tax exemptions must be strictly construed against the tax payer and in favor of the state." *Id.* "Exemptions are never presumed; nor can a statute granting a tax exemption be extended by judicial construction to create an exemption not specifically authorized." *Id.* at 338, 913 P.2d at 72.

■ CAA claims it is entitled to a property tax exemption under I.C. § 63–602C. This statute provides in relevant part:

63–602C. PROPERTY EXEMPT FROM TAXATION—FRATERNAL, BENEVOLENT, OR CHARITABLE CORPORATIONS OR SOCIETIES. The following property is exempt from taxation: property belonging to any fraternal, benevolent, or charitable corporation or society, the World War veteran organization buildings and memorials of this state, used exclusively for the purposes for which such corporation or society is organized; provided, that if any building or property belonging to any such corporation or society is leased by such owner or if such corporation or society uses such property for business purposes from which a revenue is derived which, in the case of a charitable organization, is not directly re-

lated to the charitable purposes for which such charitable organization exists, then the same shall be assessed and taxed as any other property, and if any such property is leased in part or used in part by such corporation or society for such purposes the assessor shall determine the value of the entire building and the value of the part used or leased for commercial purposes.

I.C. § 63–602C.

■ This Court has previously outlined several considerations that bear upon an organization's charitable status:

(1) the stated purposes of its undertaking, (2) whether its functions are charitable, (3) whether it is supported by donations, (4) whether the recipients of the service are required to pay for the assistance they receive, (5) whether there is a general public benefit, (6) whether the income received produces a profit, (7) to whom the assets would go upon dissolution of the corporation, and (8) whether the "charity" provided is based on need.

*In re Sunny Ridge Manor,* 106 Idaho 98, 100, 675 P.2d 813, 815 (1984). This is not an exclusive list of factors, and some of the factors may not apply in every case.

### A. The Stated Purpose Of The Undertaking

As stated in the CAA's Articles of Incorporation, its purposes are

"to provide guidance and facilities which are conducive to and will bring about an orderly development of a program to meet the economic and social needs of the area in which the said Community Action Agency, Inc. will function ..." and "This Corporation is not organized for profit, but has been organized and operated exclusively for charitable, scientific, or educational purposes within the meaning of Section 501(c)(3) of the United States Internal Revenue Code of 1954, as those statutes may from time to time be amended or superceded."

There is apparently no dispute regarding the purpose of the corporation's undertaking. The corporation is non-profit and was creat-

ed to provide low-income housing to residents in Lewiston.

## B. Whether Its Functions Are Charitable

[The term] "charitable" is not restricted to the traditional notion of financial relief for the poor, but ... would encompass a wide variety of services social, recreational, cultural, psychological, religious and others.... To be classed as charitable, an organization need not provide monetary aid to the needy; it may provide any of a number of services of public benefit. The word "charitable," in a legal sense, includes every gift for general public use, whether it be for educational, religious, physical or social benefit.

*Sunny Ridge,* 106 Idaho at 100, 675 P.2d at 815.

CAA provides financial relief for the poor. Needy individuals in Lewiston are provided housing for less than the market value. CAA is providing a service to those in need, and this is a charitable function.

## C. Whether It Is Supported By Donations

The district court held that under *Housing Southwest,* CAA did not qualify for a property tax exemption. In *Housing Southwest,* low-income housing was also involved. The basic monthly rent for each unit was $270.00, even though the market value was $400.00. *Housing Southwest,* 128 Idaho at 336, 913 P.2d at 69. Importantly, the difference in the rental amounts was subsidized by FHA loans to bring actual payment up to fair market value. *Id.* This Court held that because Housing Southwest was funded by government loans and grants, rather than private donations, it was not a charitable corporation.

The Board argues that *Housing Southwest* applies to this case, because CAA received federal and state grants to build the properties in question, and because CAA receives federal and state money each year. CAA maintains that there are several differences between this case and *Housing Southwest* which are sufficient to distinguish it.

Unlike the appellants in *Housing Southwest,* CAA does not argue that federal or state grants are donations. However, as noted only a few thousand dollars of those donations were applicable to operation of the housing project. In 1998, CAA received $760,575.01 in private contributions. However, CAA also received significant contributions from the government. In 1999, CAA received $3,563,810.00 from various government grants. The property in question was purchased using loans from the HOME program, and CAA is not required to pay interest on these loans. The operation of the housing project survives primarily on government subsidies.

CAA is correct that this is to a degree a different case from *Housing Southwest.* CAA receives some contributions from the private sector, but those contributions are a very small percentage of the budget. Housing Southwest did not. The loans and grants from the government in this case do not make up for the difference between the monthly rent and the fair market value. In *Housing Southwest* they did.

## D. Whether The Recipients Of The Service Are Required To Pay For The Assistance They Receive

■ CAA residents are required to pay for the assistance they receive—they simply do not pay fair market value for the services provided. Before being selected, the tenants must demonstrate that they are able to pay for the housing. CAA argues that the tenants are not required to pay for their assistance because it has never evicted any tenants. The Board correctly points out that eviction is always a possibility. The fact that the tenants do not pay full market price for the assistance is not enough, by itself, for CAA to be considered a charity. Otherwise, any landlord renting below market value could potentially claim to be a charity.

## E. Whether There Is A General Public Benefit

This consideration takes into account whether the charity at issue is performing a function that might otherwise be an obligation of the government. However, this element is closely tied to whether the charity at issue receives donations. In *Housing*

*Southwest,* this Court held that the alleged charity did not provide a general public benefit because Housing Southwest relied so heavily on taxpayer money. Because Housing Southwest was largely funded by the public, it did not provide a general public benefit. *Id.* at 339, 913 P.2d at 72.

CAA is also supported by taxpayer money, but not as significantly as Housing Southwest was. The private donations it receives lessen the burden on the government only nominally.

### F. Whether The Income Received Produces A Profit

CAA is a non-profit corporation. In 1998, CAA operated in a deficit. There are no stock or stockholders to receive distribution of profits. An unpaid Board of Directors representing local government, the low-income sector and the private sector governs CAA. There is no indication that CAA has ever operated at a profit.

### G. To Whom The Assets Would Go Upon Dissolution Of The Corporation

The Articles of Incorporation state that in the event of a dissolution, CAA's property and funds be disbursed to foundations or corporations organized exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. This factor weighs in favor of CAA receiving a property tax exemption.

### H. Whether The "Charity" Provided Is Based On Need

The services provided by CAA are based on need. CAA rents its apartments below the fair market value. CAA is also required, by the HOME program, to select its tenants from those whose household income is not more than 50% of the median area income for 20% of the units, and 60% of the median income for the remainder of the units. Tenants must therefore demonstrate that they need low-income housing based on their percentage of the median income for the area.

This case comes as close to the borderline in weighing factors as any that have come to this Court. It is difficult to ignore the fact that the Board granted the exemption before and after the year in question. There are apparently no facts to distinguish the years in which an exemption has been granted and

the year when it was denied. Under these circumstances it is difficult to apply the principle that tax exemptions are strictly construed against the taxpayer. *Housing Southwest,* 128 Idaho at 337–38, 913 P.2d at 70–71. However, that principle remains intact and is not altered by the vagaries of application.

 CAA has argued that because the Board granted an exemption and told CAA that as long as the buildings were being used as low-income housing the exemption would apply, that the Board should be estopped from revoking its property tax exemption. The doctrine classified as of quasi estoppel has its basis in election, ratification, affirmance, acquiescence, or acceptance of beliefs; and the principle precludes a party from asserting, to another's disadvantage, a right inconsistent with the position previously taken by him. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with the one in which he acquiesced.... *KTVB, Inc. v. Boise City,* 94 Idaho 279, 281, 486 P.2d 992, 994 (1971) (quoting *Clontz v. Forner,* 88 Idaho 355, 364–65, 399 P.2d 949, 954 (1965)). It was not unconscionable for the Board to revoke its exemption. Idaho statutes specifically allow a Board to revoke an exemption. Idaho Code § 63–602(3) states that, "All exemption from property taxation claimed under this chapter shall be approved annually by the county board of equalization." Therefore, the Board must determine, on a yearly basis, whether an organization is exempt from property tax. The Board was justified in re-examining those properties that were previously granted a property tax exemption. It was also justified in revisiting the issue and again granting the exemption. Quasi estoppel does not apply in the present case.

Balancing all relevant factors and weighing the principle that tax exemptions are strictly construed against the taxpayer the decision of the district court is affirmed.

### III.

### CONCLUSION

The decision of the district court is affirmed. The respondent is awarded costs. No attorney fees are awarded.

Chief Justice TROUT, Justices
WALTERS, KIDWELL and EISMANN
concur.